# WHEELING.

## Cox v. Boone.

### July 23, 1875.

1. J. and others are indebted to C. in the sum of $535, besides some accrued interest, due by note which is past due. The debt is for money loaned for the use of a Masonic Lodge. J. is the secretary. J., on the evening of Wednesday, the 22d day of February, 1871, about supper time, at C.'s house, by arrangement between J. and C., made and delivered to C. his check in these words, viz: "No. ——. Wheeling, 22d February, 1871. Wheeling Savings Institution.—Pay to Dr. John H. Cox or order five hundred and thirty-five dollars ($535.00) Masonic money. S. S. Jacob, Sec." J. at the time had the $535.00 deposited in the said Institution, and the Institution was in the city of Wheeling. C. resided about fifteen miles from Wheeling, and his nearest and usual postoffice, as well as that of J., was at West Liberty. The postoffice was about three or four miles from C.'s. The mail from said postoffice to Wheeling was but tri-weekly, closing at said postoffice at seven and a-half o'clock A. M., and leaving for Wheeling at eight o'clock A. M. on Tuesday, Thursday and Saturday, and arriving at Wheeling between eleven and twelve o'clock at noon; at no time later than twelve noon. The said Institution was, in fact, insolvent at and before the said 22d of February, but continued to pay its depositors until Saturday, the 25th of February, 1871, and until about noon of that day, when it failed, and ceased payment and closed its doors before the close of banking hours; and on the same evening it made a general assignment of its assets to an assignee in trust for the benefit of its creditors.—HELD:

   1. That it was not the duty of C. to mail the check to his agent or banker at Wheeling for presentment on the day he received the check.

   2. That it was not the duty of C. to mail said check before seven and a-half o'clock of the 23d of February, 1871, that being an unreasonable hour at that season of the year according to the facts proven and stated in the opinion of the Court.

1875.
June Term.

Cox
v.
Boone.

3. The said Institution having failed and closed its doors about twelve o'clock at noon on Saturday, C. was not bound to present, or cause the check to be presented, to the bank on Saturday before it failed and closed, and it cannot be said that C. was guilty of negligence or unreasonable delay in not so doing.

4. J. was not prejudiced because the check was not sent by the Saturday morning mail, because if it had been C.'s agent or banker would most probably not have received it before the Institution failed and closed; and if he had received it, he was not bound to present it before twelve o'clock of that day, but might have done so at any time before the close of regular banking hours on that day, and perhaps the next secular day (Monday).

5. C. was not bound to send the check for presentment by post, and not having done so, he was at liberty to present, or cause the same to be presented, in any other mode convenient, within the time allowed by post, and the Institution having failed and closed its doors before that time expired, and the money become lost in whole or part by reason of such failure, it cannot be held that C. was guilty of unreasonable delay, and that the money was lost by his negligence.

6. It cannot be held that the check was, under the circumstances, received by C. in satisfaction of the debt due him. But the most that can be held, in the absence of an agreement to the contrary, is, that the check was received by C. as a conditional payment or collateral security, to be a payment or satisfaction for the amount thereof if paid or lost by the negligence of C.

*Supersedeas* to a judgment of the circuit court of Ohio county, rendered on the 21st day of January, 1875, granted on the petition of John H. Cox, the plaintiff below. The defendants were Hamilton Boone, Samuel S. Jacob, John C. Ferris, John H. Montgomery, Joseph W. Ferrill, J. A. Curtis, Peter Delaplaine and A. M. McCulloch, Jr. The other facts appear in the opinion of the Court.

The Hon. Thayer Melvin, judge of said circuit court, presided at the trial below.

*C. W. B. Allison*, for the appellant.
*Robert G. Barr*, for the appellees.

HAYMOND, PRESIDENT:

This is an action of assumpsit brought and determined in the circuit court of the county of Ohio, and is brought

to this Court by *supersedeas.* The trial of the cause was submitted to the court in lieu of a jury, and the court rendered judgment in favor of the defendants upon the proofs.—The plaintiff excepted to the opinion and judgment of the court, and in the bill of exceptions, which is duly signed, the court certified the facts proven before it at the trial upon which its judgment is based. By the bill of exceptions it appears that on the 29th day of May, 1868, the defendants executed and delivered to the plaintiff their joint and several note in these words:

"$600.00                         MAY 29, 1868.

Two years after date, we or either of us promise to pay Dr. J. H. Cox, or order, the sum of six hundred dollars, for value received.

| H. BOONE, | J. W. FERRELL, |
| S. S. JACOB, | WM. H. ANDERSON. |
| JOHN C. FERRIS, | J. A. CURTIS, |
| JOHN H. MONTGOMERY, | PETER DELAPLAINE, |
| | A. M. MCCOLLOCH, JR." |

That said note was given in consideration of money loaned ($600) for the use and benefit of the Masonic Lodge at West Liberty, Ohio county, West Virginia, of which the defendants were members. About the time the note matured, the interest was paid thereon by the Lodge for two years, and $65 upon the principal. In December, 1870, negotiations took place between the plaintiff and the defendants as to the payment of the note, by which it was agreed that the Masonic Lodge would pay to the plaintiff, by the 27th day of that month, $535.00, the principal then due on the note, upon the receipt of which the plaintiff was to deliver up the note on the Lodge, and look to the Lodge for the payment of the remaining interest then due on the note which the Lodge was to pay him, but no time was mentioned when the interest was to be paid, but it was to stand until such time as the Lodge could pay it. The money was not paid on the 27th day of December, 1870. The defendant, Samuel S. Jacob, one of the makers of the note,

was the acting secretary and treasurer of the Lodge. In January, 1871, the plaintiff was notified by said secretary to bring the note to the Lodge at its next stated meeting, when the Lodge would try and pay him. The plaintiff is a practicing physician, and resided in the county between three and four miles from the town of West Liberty, where the Lodge was held. Owing to professional business the plaintiff did not attend the Lodge at the time specified, and the Lodge then appropriated the money designed to be paid to the plaintiff for another purpose. No other negotiation took place between the pliantiff and the defendants, or the Lodge, until the 22d of February, 1871, when in the evening of that day, the plaintiff having arranged to make a professional visit in the country, about half way between his residence and the town of West Liberty, and whilst himself and family were at their supper the said S. S. Jacob, who also lived in the country, near to West Liberty, but in an opposite direction from the plaintiff's house went to plaintiff's house and proposed to consummate the previous arrangement as to the payment of the note, to which the plaintiff assented. Jacob asked the plaintiff whether he would prefer $535, in cash or take a check on the "Wheeling Savings Institution," which was a corporation doing a banking business in the city of Wheeling, West Virginia, twelve miles from the town of West Liberty, and over fifteen miles from plaintiff's residence; said bank being then in good repute, but badly insolvent, as shown a few days afterwards, and has been very insolvent ever since. The plaintiff replied that he would as soon take the check as the money. The said Jacob then and there gave to the plaintiff the check which is attached to and referred to the plaintiff's declaration and is in the words and figures following, to-wit: (The part in *italics* being printed.)

·"No.———      *Wheeling,* February 22, 1871.
*Wheeling Savings Institution Pay to* Dr. John H. Cox *or* order five hundred and thirty-five *dollars* (Masonic money).                    S. S. Jacob, Sec."

1875.
June Term.

Cox
v.
Boone.

No stamp is or was at any time attached to the check. At the time the check was given, Jacob stated that he had no stamp, but they would stamp it at the Bank, and requested the plaintiff to tell the bank to stamp it at the bank for him; that Quarrier would stamp it. Quarrier was the treasurer and acting cashier of the bank. Plaintiff proposed that he would stamp it himself, but Jacob repeated in reply that "Quarrier will stamp it." The plaintiff then received the check and delivered up the note to Jacob, who took the note home with him. The check was delivered at or shortly before sun-down on Wednesday, the 22d day of February, 1871. Jacob ate supper at the plaintiff's house, and rode to his home through West Liberty arriving at the latter place about dark—the plaintiff accompanying him about a mile and a half or about half way to West Liberty, when they separated, the plaintiff going to the place where he was to make his professional visit. At the time the check was given, said Jacob had a sufficient amount of money in said bank to redeem the check, which was the money of the Lodge, and which has never since been interfered with by him or the Lodge. West Liberty was the post-office of the plaintiff as well as of Jacob. The mail between that post-office and Wheeling is and was then but tri-weekly, running on Tuesday, Thursday and Saturday of each week, leaving West Liberty at eight o'clock A. M., and arriving at Wheeling between eleven or twelve o'clock A. M., according to the state of the roads; at no time later than 12 o'clock noon according to the state of the roads. The mails were closed at West Liberty at 7½ o'clock A. M., and were distributed and ready for delivery at the Wheeling post-office within from five to ten minutes after their arrival there. The plaintiff, at that time, had money on deposit and did his banking business with the Bank of Wheeling, another banking house in the said city of Wheeling. The Wheeling Savings Institution continued its banking business, paying its depositors checks on demand,

until Saturday the 25th day of February, 1871, and until about noon of that day, when it failed and ceased payment and closed its doors, before the close of banking hours. That evening it made a general assignment of its *assets* to an assignee in trust for the benefit of its creditors. Among its *"assets"* (evidently meaning debts due by it,) was an account showing a credit to S. S. Jacob, Masonic Lodge, for $535.00. The plaintiff did not mail the draft for collection or present the same to the drawee for payment at any time on or before Saturday, the 25th day of February, the day of its failure. He did not send it by mail because he intended to go to Wheeling and present the check for payment in person on Saturday, the 25th, but on that day it became inconvenient by reason of his professional business preventing him from going to Wheeling, and he did not do so. Plaintiff could not have collected the check through the next morning's mail (Thursday) without serious inconvenience, and riding after night, or getting up before daylight and neglecting his business. On Sunday, the 26th day of February, 1871, the day after the bank failed, the plaintiff heard of its failure, and of the excitement in Wheeling by reason thereof, and therefore, did not go to Wheeling until Tuesday or Wednesday following, and about the first of March, 1871. On the next day after he was at Wheeling, to-wit: on Thursday or Friday of the next week after the check was given, the plaintiff notified the said S. S. Jacob of the failure of the bank and the non-payment of the check, and offered to return to him the check and demanded the note, and said he was willing to make any reasonable arrangement about it by waiting on the Lodge until they could pay him. Jacob replied that he would report the facts to the Lodge and await their action on the matter. At the meeting of the Lodge a few evenings after, the plaintiff and said Jacob were present. Jacob made his report to the Lodge, and informed the plaintiff

1875.
June Term.

Cox
v.
Boone.

64

that he had the note there, but it was paid. After Jacob made his report to the Lodge he tore the names off from the note, but preserved the note and the names to abide the result of any trouble about the note, so that the parties on the note could know what their proportion was, and all pay, if payment was required of them. These were all the facts proven. The declaration contains a count on said note and several other counts including the common money counts.

Byles in his work on Bills, 5 Am. ed. 92, says: "We have already observed that checks are in legal effect inland bills of exchange, payable to bearer on demand, and we shall hereafter see that an ordinary bill of exchange, payable on demand, must be presented for payment, or if the parties live at a distance, forwarded for presentment within a reasonable time, which is generally held to comprehend the day after it is issued. Such also is the general rule as to the presentment of checks." "The result of the cases," says Tindal, C. J., *Rickford v. Ridge* to *Boddington v. Schlencker*, "is, that the party receiving a check has till the following day to present it, where there are the ordinary means of doing so. Formerly it was held, that the check must be presented on the *morning* of the next day; it is now, however, firmly established, that the holder has the whole of the banking hours of the next day within which to present it. But there is one material difference between the liability of the *drawer* of a check and the drawer of a bill payable on demand. The drawer of a check is not discharged by the holder's failure to present in due time, unless the drawer has sustained, from the delay, actual prejudice, as by the failure of the banker. The check is an absolute appropriation of a sum of money in the banker's hands to lie till called for; but by the delay the holder takes the risk of the bank's failure." On page 94 he says further: "If the party receiving the check from the drawer do not live in the same place with the drawee, he should send it to his banker or other agent by the next day's

post, and they should present on the day after they have received it." In Parsons on Notes and Bills, pages 72, 73 and 74, it is said: "If a check be presented long after date and is refused payment, not on account of a failure, but because the drawer has closed his account or withdrawn his funds the drawer is still liable. Where the drawer, drawee and payee of a check live in the same place, the payee has still a day for his presentment. But if it is drawn on a distant place, it has been *held*, in England, that the payee has until the next secular day to forward it, and his agent has till the day after receiving it for presentment and demand. As between the holder of a check and an indorser of it, or the transferer and the drawer, there can be no doubt that it must be presented for payment within a reasonable time; and it seems, by the best authority, that this is the same time as required in the case of a bill or note. But as between the holder and drawer, it seems to be settled, although not without some dissent, that the drawer is not discharged by any delay of presentment whatever, unless he can show that he has been injured thereby, as by a failure of the drawee, or a change in the state of accounts, or otherwise." See also note L. 74. In Chitty on Bills, 419, it is said: "With respect to a *check on a banker* it is now settled, that it suffices to present it for payment to the banker at any time *during banking hours* (in London five o'clock) on the day after it is received, and that no laches can be imputed to the holder in not presenting it for payment early in the morning of the second day, although the bankers paid drafts on them till four o'clock in the afternoon and then stopped payment." See also note (H) same page. The same author, on page 516 says: "Sending notice by a messenger, instead of the post, although he do not arrive quite so early as the post, will not prejudice, provided he deliver the notice on the same day as that on which it would have arrived by the post." It seems from the authorities that when the holder and drawer of a check do not reside in the.

same place, but some distance apart, that the same rule as to forwarding the check for presentment, as to the time of forwarding, prevails as in case of forwarding notice of dishonor of a negotiable note to endorsers, and the holder in each case is not guilty of laches or negligence if the check is forwarded to his banker or agent by regular post. This being so it is material to ascertain the rule on this subject. There seems to be no little confusion on the subject. Story on Bills, section 290, says : "In the first place then it is not by our law necessary in any case to give notice, either by post or otherwise, on the very day on which the dishonor and protest took place, although the holder is at liberty to do so at his option. He is always allowed, by law, a whole day for this purpose, and is not compellable to lay aside all other business to devote himself to that particular purpose. For it would be most inconvenient and unreasonable to require such strictness, as it might interfere with other business and duties of quite as pressing an importance ; and therefore it is sufficient, if he sends notice by the post or otherwise by the next day." See also note 1 thereto. "It is said in some cases that notice should be sent by the first mail of the next day after dishonor but the authorities in which it was necessary to decide the point held that it may be sent by any mail of that day. Thus when one mail leaves in the morning and another in the evening, the holder has the right to elect which one he will use by which to transmit the notice. In many cases it is said that notice should be sent by the mail of the next day after dishonor ; but most of these were cases which hold that a notice so sent is sufficient, which is undoubtedly true, else the court only intended to state the general rule without the qualifications. It is obvious if there is no mail the next day, the notice cannot be sent by such a mail ; and if by this rule is meant that notice must be sent at any rate by a mail of that day, we should say that it is incorrect. So if the only mail which leaves on the day after its dis-

honor should close at 2 A. M., and leave at half·past, our opinion is, that notice need not be sent by that mail, but may be forwarded by that of the next day. The most recent authorities in which it has been necessary to pass directly upon this point have so decided and the rule, and, as we think, the correct one, is affirmed to be, that the holder is bound to forward the notice as early as by a mail of the day after ·dishonor, which does not start at an unreasonably early hour; and if there is no mail which leaves on that day after a reasonably early hour, the notice is to be forwarded by the next mail which starts thereafter. With respect to what is not a reasonably early hour, no precise rule can be laid down, except that in general—the limit must be defined by business hours, which depend upon the particular habits of the mercantile community in each place, and from this fact arises much of the discrepancy which we find in the cases upon the point." Parsons on Promissory Notes and Bills, 510, 511, 512· See also the numerous cases cited in notes (M.) & (O.) In *Carter v. Burley*, 9 N. H., 558, 570, Parker C. J. in laying down the general rule that notice must be sent ·early by the mail of the day following dishonor, said: "'This rule, however, must be qualified so far that, if the party receiving the notice cannot, by the exercise of reasonable diligence, forward notice to a prior party by the mail of the day following, it will be sufficient if sent by the next. In this country where many of the mails go out at an early hour of the morning, and are sometimes closed at an early hour of the evening before, it would be impracticable in some instances, and nearly so in many more, to prepare and forward a notice by ·the mail of the next day, when notice was received late in the afternoon, or in the evening." This case is, ·and others bearing on the question, are referred to in 1 Parsons on Notes and Bills, 511, note (1.) See also opinion of Judge Carr in case of *Brown & Sons v. Ferguson*, 4 Leigh 50. In *Davis & Co. v. Hanly* 7 Eng. (Ark.)

1875.
June Term.

Cox
v.
Boone.

645, where the mail went out at an unreasonably early hour of the day after the notice is received, the court held it unnecessary to send the notice by that mail, although the next mail does not appear to have started until a week from that time. After examining many authorities upon the subject, and reflecting thereon, it seems to me that the rule stated by Mr. Parsons in his said first volume on pages 511 and 512, is the most reasonable and correct that can be adopted; that a rule less liberal would be unnecessarily harsh and strict, and in many cases would operate great wrong and injustice. Reasonable diligence is all that should be required, and what is reasonable diligence must be determined from the circumstances and surroundings in each case. In *Purcell v. Allemong & Son*, 22 Gratt., 739, it was *held* that,

"1. A check upon a bank must be presented for payment in a reasonable time, in order to charge the drawer."

"2. If a check is presented for payment, and payment refused, and notice is given to the holder at any reasonable time before the bank fails, the drawer is not discharged, if it be shown that he is not prejudiced by the delay; and if prejudiced he is only discharged *pro tanto*."

"3. If the holder of a check fails to present it for payment, when he might do it, until after the bank fails, the drawer is not responsible, if he had funds in the bank for its payment."

This is part of the syllabus of the case, as reported. In *Bell v. Alexander*, 21 Gratt. 1, it was *held* that "B is not relieved from the payment of a check by the delay of A to present it; and in any case he would only be relieved to the extent that he was injured by the delay."

The *first* question to be considered in this case is, was the plaintiff guilty of negligence under the facts proven and the law in not sending the check to his banker or agent in Wheeling by the mail which closed the morning

1875.
June Term.

Cox
v.
Boone.

after he received the check at half-past 7 o'clock, A. M., and left at 8 o'clock, A. M. Let it be remembered that the check was received late in the evening, about supper time on the 22d of February, which was Wednesday, and the mail that left plaintiff's post office for Wheeling on the next day, Thursday, was closed at half-past-seven o'clock, A. M., and left at eight o'clock, A. M. This was in mid winter when the days were quite short, and half-past-seven o'clock in the morning was scarcely daylight. The plaintiff resided about three or four miles from the post office. It would certainly be establishing a very strict rule to require the plaintiff to have mailed the check before half past seven o'clock, under the circumstances, and indeed such a rule applied in this case would be unnecessarily strict, and I think unjust. The hour was unreasonably early—it cannot be said, under the circumstances, that the hour the mail closed was within business hours. The weight of authority is that plaintiff was not required to send said check by mail on the day he received it, nor to mail it on that day. To have mailed it on the morning of the 23d, according to the facts proved, the plaintiff would have been required to have gotten up in the night and rode to the post office before day light in the morning. To require this, I think would be unreasonable. The next mail that left the post office closed on Saturday at half past seven o'clock A. M, and left at eight, A. M. If the check had been sent by this mail it would have arrived in Wheeling somewhere between eleven and twelve o'clock noon. Now if the plaintiff had sent the check by this mail to his agent, the agent might or might not have received it till after twelve o'clock at noon. The reasonable probability is that it would not have been received before twelve o'clock, by which time the "Savings Institution" was closed as insolvent, and was then, and has been from thence hitherto, *very insolvent*. But if the plaintiff's banker or agent had received the check at or before twelve o'clock at noon of that day he would have been entitled to the whole day

within business hours to present the check, at least, and perhaps under the authorities, he would not generally be required to present the check on the same day he received it, nor until the next secular day within business hours. The Institution having broke up and closed at twelve o'clock on Saturday, which was before business hours of that day closed, it cannot be said that the drawer of the check was prejudiced or injured by the check not having been sent by the mail on Saturday, or that the plaintiff was guilty of culpable negligence for which he should suffer loss by not sending the check by that mail, because it cannot be said, in a legal sense, that the failure to send the check by that mail was the cause of the money being lost, as the exercise of the diligence required by the law did not require that the check should have been presented to the bank for payment before or at twelve o'clock at noon of that day. Before it can be said that plaintiff was guilty of negligence in not presenting the check, the whole time allowed him by law to have sent the check by post and to procure the presentment must have expired before the bank broke and closed. If that time had not expired before the bank broke and closed, it cannot be said that the plaintiff was guilty of negligence and unreasonable delay in presenting the check for payment. The plaintiff was not bound to send the check by mail, but if he failed to send it by mail, the law allowed him the same time at least in which to present it for payment that it allowed for its presentment if it had been sent by mail. If he had gone in person to Wheeling on Saturday the law would have allowed him the whole of that day within business hours to present the check for payment, if not longer. The institution having broke and declared itself insolvent on Saturday, the 25th of February, at noon, it cannot be said that plaintiff was guilty of unreasonable delay in not presenting the check for payment before that day. The plaintiff was not in default, therefore, when the bank broke and ceased payment be-

cause of insolvency. Was it necessary for the plaintiff to go through the useless formula of presenting the check after the bank had become insolvent and closed its doors against its creditors? It has been held in the King's Bench that the shutting up of a bank when any demand there made would have been inaudible is substantially a refusal by the bankers to pay their notes to all the world. But it was decided in the same case on error in the Exchequer Chamber that an allegation in the declaration that the makers became insolvent, ceased and wholly declined and refused then and thenceforth to pay, at the place specified, any of their notes, is insufficient, not being equivalent to an allegation of presentment. But it is conceived, notwithstanding the observations of the court in the last case, that it cannot be necessary for the holders of the notes of a bank which has notoriously stopped payment and is shut up to go through the empty form of carrying their notes up to the bank doors, and then carrying them home again." Byles on Bills, 330.

In the case at bar the Institution failed and ceased payment and closed its doors about 12 o'clock at noon and before the close of banking hours, and on the same evening made a "general assignment of all its *assets*" to an assignee in trust for the benefit of its creditors of whom the drawer in this case was one. Under the facts proven in this cause it cannot be said that the drawer was prejudiced by the failure of the plaintiff to present the check after the institution had failed, closed its doors and made a general assignment, and ceased to do business—*prima facie*, at least, the drawer was not injured.

It is not sufficiently shown that the check was received by the plaintiff in satisfaction of his debt against the defendants, or that it was agreed that he should so receive it. I apprehend the most that can be said in reference to this subject is that the plaintiff took the check as a conditional payment or collateral security, which was to be

65

a payment or satisfaction if the check was paid or if it should be lost by the negligence of the plaintiff. See on this subject the opinion of this Court in the case of *Miller v. Miller*, decided at the present term of this Court and the authorities there cited. The plaintiff in a few days after the institution failed offered to return the check to the drawer and demanded the note but the drawer refused to receive the check and refused to deliver the note to the plaintiff—the drawer claiming that the note had been paid. Upon the whole it seems to me upon the facts proven, that the plaintiff's debt was never paid and that the $535.00 for which the check was given was not lost by the negligence or unreasonable delay of the plaintiff and the drawer was not prejudiced by the negligence of the plaintiff in the presentment thereof for payment, and that the plaintiff is entitled to recover and should have judgment against the defendants for the amount of his said debt, deducting the actual payment shown by the facts proven.

For the foregoing reasons the judgment of the said circuit court rendered in this cause on the 21st day of January, 1875, must be reversed and the plaintiff in error recover against the defendants in error his costs in this Court in this cause expended. And this Court proceeding to render such judgment as the said circuit court ought to have rendered, upon the facts proven before it, and as certified to this Court, it is considered that the plaintiff recover against the defendants the sum of $————, together with his costs about the prosecution of this suit expended.

Hoffman and Moore, Judges, concurred.

JUDGMENT REVERSED AND JUDGMENT RENDERED BY APPELLATE COURT, FOR PLAINTIFF BELOW.